### BADGEROW et al. v. MANHATTAN TRUST CO. et al.

(Circuit Court, S. D. New York. June 29, 1896.)

EQUITABLE ASSIGNMENT—LIEN.

An agreement entitling the holder thereof to receive a certain number of bonds of a railway company at a future date, by the terms of which agreement no particular bonds are to be transferred to such holder or placed under his control until said date, and by which the other party to the agreement is permitted to deliver any bonds of the railway company purchased in the market or otherwise, or to discharge all obligations by a payment in cash, does not effect an equitable assignment of the bonds or give an equitable lien thereon to the holder of such agreement.

This was a suit by Gordon R. Badgerow and others against the Manhattan Trust Company, Amos T. French, individually and as executor of Francis O. French, deceased, and the Wyoming Improvement Company, to establish a lien upon certain bonds. For a full statement of the facts involved, see the report of the decision overruling a demurrer to the bill in 64 Fed. 931.

Chas. E. Patterson and Oliver P. Buel, for complainants.
John L. Cadwalader, for defendant Manhattan Trust Co.
De Lancey Nicoll, for defendants French and Wyoming Imp. Co.

COXE, District Judge. It is conceded on all hands that the proposition at issue was correctly stated upon the decision of the demurrer, namely, in order to recover the complainants must aver and prove an equitable lien upon the bonds of the Nebraska Company. 64 Fed. 931. The facts alleged in the bill fully appear in the reported case. These need not be restated. Very little material to the issue has since been added. The bill contains this averment:

"(12) When your orators contributed to the construction fund as aforesaid, it was understood by and between them and the improvement company and

the Manhattan Trust Company, to the knowledge of Francis O. French and Amos T. French, that the bonds of the Nebraska & Western Railway Company, when issued, on account of said section of railway from Covington to O'Neill, and the stock of the improvement company when issued, should, to the amounts specified in the subscription receipts and trust certificates hereinbefore mentioned, be set apart and reserved for delivery to your orators at the time specified in said receipts and certificates respectively."

The bill was sustained upon the theory that under this allegation, though, perhaps, inartistic in form, the complainants might be able to adduce proof of an agreement that they were to have a lien upon the bonds of the Nebraska Company. The court never for a moment believed that they could succeed without such proof. It now appears that the failure of the pleader to allege an agreement was due not to oversight or inadvertence, but to the fact that he could not do so truthfully. The proof does not even sustain the inadequate averment. Not only was there no contract, but there was no common "understanding" that an equitable lien was to be created.

. No witnesses were called by the defendants. The complainants' witnesses substantially agree 'n saying that the intention was to build the road section by section, "to build one section and to procure bonds on it by placing those and procuring funds to go on with the next section." Though using different language the complainants agree in saying that it was their understanding that the road was to be bonded and the bonds used in its further construction. No one of them testifies to any agreement or understanding modifying or adding to the stipulations of the written agreements. Their testimony, in short, is in full accord with the contention of the defendants and in direct opposition to the theory of the bill. Indeed, the court understands that the complainants do not pretend that the oral proof adds anything to the written stipulations.

Counsel concede that the subscription agreement and receipts "express the contract of the parties." The question, then, is to be determined upon these papers alone. · Do they establish an equitable lien? In order to create such a lien the intent to transfer the bonds must have been clear and explicit. The improvement company must have divested itself of all control over them and all power to pledge or sell them and pay the debt of the complainants in cash. If the complainants' interest in the bonds was contingent or revocable there can be no lien. The bonds must have been so set aside and dedicated to complainants' use that the court at all times would have restrained their transfer or disposition by the improvement company until the lien was satisfied. Christmas v. Russell, 14 Wall. 69; Wright v. Ellison, 1 Wall. 16.

The bill alleges that shortly after the 1st of February, 1890, an agreement was effected between the improvement company and the trust company by which all the bonds issued or agreed to be issued to the improvement company were hypothecated with the trust company to secure loans to the improvement company in the sum of $1,000,000; that subsequently all the bonds were

hypothecated to secure a further loan of $600,000. The wisdom and justice of these transactions are not in question. The simple inquiry is, were the bonds of the Covington-O'Neill section in February, 1890, so impressed with a lien in favor of the complainants that the transfer to the trust company was, for that reason, illegal and in derogation of complainants' rights? After a careful examination of the law and the facts the court is constrained to return a negative answer. It will be noted that the certificate upon which complainants rely did not entitle them to receive the bonds until May, 1891. The bonds they were to receive were not specifically designated. They were to be bonds of the Nebraska Railway Company. That was all. It cannot be doubted that bonds issued upon any section of that railway purchased in the open market May 1, 1891, could have been delivered under the subscription receipt. There is no pretense that the bonds were ever transferred to complainants, or were under their control for an instant. Moreover, up to and including May 1, 1891, the improvement company was at liberty to discharge all obligation to the complainants and cancel their receipts on paying 95 per cent. and accrued interest. How can there be an equitable assignment in such circumstances? How can the complainants maintain that the bonds were set apart and sequestered for their especial use when the very instrument upon which they found their contention expressly provides that the bonds are to be delivered only in the event that the improvement company prefers to do this rather than to pay the debt in cash? In other words, by paying cash the improvement company could obliterate the agreement of which it is sought to predicate the lien. The venture was probably ill advised and certainly was unfortunate as to time, meeting as it did the advance eddies of the fierce financial hurricane which swept so many enterprises to ruin. Everyone connected with it lost money, and it is difficult to see why the complainants should not bear their share of the loss. The court is convinced that there was never any agreement or even an understanding that the complainants were to have a special privilege enabling them alone to escape in case disaster overtook the enterprise. Subject to the reasonable modifications contained in the letter of April 8th the agreement was alike as to all the subscribers. They all stood upon the same plane and were to bear together the losses and share the gains of their common venture. The enterprise was projected and carried out upon the familiar plan generally adopted in such cases. Had it succeeded there would have been no complaint. Having failed the ingenious efforts of the complainants to save something from the general ruin is but a repetition of the history of such disasters.

As the proof wholly fails to establish the existence of an equitable lien it follows that the bill must be dismissed.